UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

PREMIER PET PRODUCTS, LLC,

    Plaintiff,

v.                                         Civil Action No. 3:09cv293

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA,

    Defendant.

## MEMORANDUM OPINION

On May 5, 2009, Plaintiff Premier Pet Products, LLC ("Premier") filed a Complaint against Defendant Travelers Property Casualty Company of America ("Travelers"), alleging breach of contract arising from Travelers' refusal to defend and indemnify Premier in a trademark infringement suit brought against Premier by Multi-Vet, Ltd. ("Multi-Vet") ("the Multi-Vet Suit"). (Docket No. 1.) The parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

In September of 2009, the parties submitted cross motions for partial summary judgment as to the duty to defend. On September 28, 2009, the Court held a hearing on the matter. During argument, Premier proffered a full copy of the insurance policy at issue, and the Court ordered supplemental briefing to address an argument raised by Premier: the deletion from the policy at issue of the standard policy language excluding from coverage trademark infringement, while adding an endorsement excluding from coverage "infringement of . . . title." Cross briefing is

1

complete, and the matter is ripe for adjudication. For the following reasons, the Court determines that no duty to defend Premier arose as a result of the Multi-Vet Suit.

## I. Factual and Procedural Background

### A. Premier's Policy

Premier manufactures, markets, advertises, and sells dog collars that seek to control problem barking. (Compl. ¶ 10, *Premier Pet Prods. LLC v. Travelers Prop. Cas. Co. of Am.*, Civil Action No. 3:09cv293 (E.D. Va. May 5, 2009) ("Premier Compl.").) Travelers issued Premier a Commercial Insurance policy, Policy No. Y-630-99093A201-TIL-04 ("the Policy"), for the period of May 25, 2004 to May 25, 2005, containing limits of 2 million dollars in the aggregate and 1 million dollars per occurrence for advertising injury ("the Policy").[1] (Premier Compl. ¶ 11.) For each successive one-year period, continuing until May 25, 2008, Travelers issued Premier an identical Commercial Insurance policy.[2] (Premier Compl. ¶ 11.) Premier purchased commercial insurance policies from Travelers "to insure and protect its business." (Premier Compl. ¶ 11.)

The Policy contains a "Web Xtend Liability" agreement that modifies the portion of the insurance contract entitled "Coverage B. Personal and Advertising Injury Liability (Section I -

---

[1] Additionally, Travelers issued Premier a Commercial Excess Liability Insurance policy, Policy No. YSM-CUP-927K1286-TIL-04, for the period of May 25, 2004 to May 25, 2005, containing limits of 4 million dollars for advertising injury. (Premier Compl. ¶ 12.) For each successive one-year period, continuing until May 25, 2008, Travelers issued Premier an identical Commercial Excess Liability Insurance policy. (Premier Compl. ¶ 12.)

[2] The parties provided only the policy applicable to the May 25, 2006 to May 25, 2007 term. (Premier Compl. Ex. A; Additional Ex. in Supp. of Premier Pet's Mot. Partial Summ. J. ("Full Policy").) The parties do not dispute that all other policies issued during the relevant time period do not differ materially from the 2006-2007 Policy.

Coverages)," and replaces it with "Coverage B. Personal Injury, Advertising Injury and Web Site Injury Liability." (Premier Compl. Ex. A.1.)[3] The original language of Coverage B stated:

> COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY
> . . .
> 2. Exclusions
> This insurance does not apply to:
> . . .
> I. Infringement of Copyright, Patent, Trademark Or Trade Secret
> "Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.
> However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

(Full Policy, Commercial General Liability Coverage Form 5-6.) The Web Xtend Liability agreement, as sold to Premier, deletes Coverage B, but includes exclusion "i," and states:

> 1. Insuring Agreement. a. We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "advertising injury" . . . to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for . . . "advertising injury" . . . to which this insurance does not apply. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. . . . b. This insurance applies to: . . . (2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services . . . .

(Premier Compl. Ex. A.1.a, 1.b.(2).)[4]

---

[3] Premier's Exhibit A consists of a series of separately paginated documents. Here, the Court cites to the numbered pages of the Web Xtend Liability agreement.

[4] The parties do not dispute that the other injuries defined in the Policy, including "personal injury" and "web site injury," do not pertain to the issue at bar.

3

The Web Xtend Liability agreement defines "advertising injury" to include:

> Infringement of copyright, title or slogan, provided that claim is made or 'suit' is brought by a person or organization claiming ownership of such copyright, title or slogan.[5]

(Premier Compl. Ex. A.4 § V. "Advertising injury" c.)

The agreement does not contain a definition of "title" as it applies to advertising injury. The parties ask this Court to determine whether or not "title" could encompass coverage for a case alleging trademark infringement, thereby invoking a duty to defend. The Court must also evaluate whether the conduct alleged commenced in the course of advertising Premier's products or services, and whether harm ensued. *See Solers, Inc. v. Hartford Cas. Ins. Co.*, 146 F. Supp. 2d 785, 792 (E.D. Va. 2001).

### B.   The Multi-Vet Initial Complaint

On April 1, 2008, Multi-Vet sued Premier in the United States District Court for the Southern District of New York. (Compl., *Multi-Vet Ltd. v. Premier Pet Prods., Inc.*, No. 08cv3251 (S.D.N.Y. Apr. 1, 2008) ("Multi-Vet Initial Compl."). The Multi-Vet Suit alleged that Premier manufactured and sold dog training collars bearing the designations "Gentle Spray Bark Citronella Anti-Bark Collar" and "Gentle Leader Spray Sense Anti-Bark Collar," in competition with Multi-Vet's products, which bear the trademarked name, "GENTLE SPRAY®." (Mult-Vet Initial Compl. ¶¶ 4, 9-11, 16.) Multi-Vet owns the rights for the trademark "GENTLE SPRAY®." (Multi-Vet Initial Compl. ¶ 11.)

---

[5] The parties do not dispute that the other injuries arising out of advertising injury addressed in the Policy, including slander, libel, or false light, do not pertain to the issue at bar. (Premier Compl. Ex. A.4 § V.a-c.).

The Multi-Vet Suit asserted three claims for relief: trademark infringement in violation of the Lanham Act, 15 U.S.C. 1114; false designation of origin in violation of the Trademark Act, 15 U.S.C. 1125(a); and common law unfair competition. (Multi-Vet Initial Compl. ¶¶ 17-35.) Specifically, Multi-Vet alleged that "Premier has sold and is selling dog training collars in the United States bearing the infringing designations 'Gentle Spray' and 'Gentle Leader Spray Sense' in direct competition with Multi-Vet's products." (Multi-Vet Initial Compl. ¶ 16.) Multi-Vet alleged that Premier's "sale" of dog training collars bearing these designations was "without . . . permission," and that Premier "used" the infringing designations "with the willful purpose and intent of misleading the public and trading upon the good will and reputation" of Multi-Vet. (Multi-Vet Initial Compl. ¶¶ 18-19.)

Multi-Vet further alleged that "Premier's use" of the trademarked names constituted "false and misleading descriptions and representations of fact in interstate commerce," that "Premier's use of the [trademarks] is misleading and confusing the public and creates a likelihood of injury to Multi-Vet's public image and reputation," and that because of "Premier's use of the [trademarks], the public is likely to falsely associate the attributes and characteristics of Multi-Vet's products to the dog training collars originating from Premier." (Multi-Vet Initial Compl. ¶¶ 24, 30, 31.)

The prayer for relief sought to enjoin and restrain Premier from "manufacturing, having manufactured, producing, having produced, distributing, circulating, selling, offering for sale, advertising, promoting, using or displaying dog training collars or any other products" bearing the infringing trademarks, and to direct Premier to "recall all of its product and marketing,

promotional, and advertising material" bearing the infringing designations or designations confusingly similar to Multi-Vet's trademarks. (Multi-Vet Initial Compl. Prayer for Relief a, b.)

After suit had been filed, Plaintiff notified its insurance carrier, Defendant Travelers, requesting that Travelers defend and indemnify Premier for the Multi-Vet Suit. On June 4, 2008, Travelers refused to defend and/or indemnify Premier in the Multi-Vet Suit. (Premier Compl. Ex. C 6.) Travelers cited Coverage B of the Policy issued to Premier, stating as its grounds for refusal that, among other reasons, "There are no allegations that Premier Pet committed one or more of the enumerated 'advertising injury' offenses in the course of advertising your goods, products or services." (Ex. C 6.)

On August 12, 2008, Travelers filed suit in this Court against Premier and Multi-Vet, seeking a declaration regarding Travelers' duty to defend Premier in the Multi-Vet Suit ("Travelers Complaint"). (Premier Compl. ¶ 29.)

C.  **The Multi-Vet Amended Complaint**

On October 29, 2008, Multi-Vet filed an Amended Complaint in the Multi-Vet Suit, asserting additional claims of trademark infringement for Premier's alleged use of the trademark, "NO SHOCK NO PAIN," and Premier's alleged infringement of Multi-Vet's distinctive trade dress. (Am. Compl. ¶ 10, *Multi-Vet Ltd. v. Premier Pet Prods. Inc.*, No. 08cv3251 (S.D.N.Y. Oct. 29, 2008) ("Multi-Vet Amended Compl.").) Specifically, in the Amended Complaint Multi-Vet alleged that Premier used the Multi-Vet trade dress to identify its dog training collars, and that such use constitutes a false and misleading statement of fact or representation in interstate commerce, misleads and is likely to confuse the public, and is likely to cause the public to "falsely associate the attributes and characteristics of Multi-Vet International's products to the

dog training collars originating from Premier." (Multi-Vet Am. Compl. ¶¶ 37, 43, 44.) Multi-Vet defined its trade dress to include:

> Packaging, marketing, advertising, and promotional materials . . . that include[] . . . the "One size spray device fits all breeds" slogan, the "Stop problem barking" slogan, the "The #1 recommended solution" slogan, the "Clinically proven 2X more effective than shock collars" slogan, the "The . . . . Citronella anti-bark collar . . . delivers a harmless burst of etc. . . ." slogan, and the "When to use. . . ." instructions."

(Multi-Vet Am. Compl. ¶ 24.)

On October 31, 2008, Premier tendered the Multi-Vet Amended Complaint to Travelers. (Premier Compl. ¶ 25.) On November 17, 2008, Premier filed its Answer and Counterclaim to the Travelers Complaint. (Premier Compl. ¶ 30.)

On December 2, 2009, Travelers agreed to provide Premier a defense against the Multi-Vet Suit under policy number Y-630-9903A201-TIL-04, subject to a full reservation of rights.[6] (Premier Compl. Ex. E, Letter from Ann Marie Thiergartner, Technical Specialist, Travelers Property Casualty Company of America, to Margo S. Brownell, Maslon Edelman Borman & Brand, LLP, at 1 (Dec. 2, 2008) ("Ex. E"), at 1.) Policy number Y-630-9903A201-TIL-04 applies to the policy period of May 25, 2004 to May 25, 2005. (Ex. E 1.)

On December 8, 2008, Travelers filed its Answer to the Counterclaim. (Premier Compl. ¶ 31.) On or about January 13, 2009, the Travelers Complaint was dismissed without prejudice. (Premier Compl. ¶ 32.)

---

[6] The parties agree that the Court must consider only the Multi-Vet Initial Complaint in its analysis of the duty to defend. If the duty to defend arose under the Multi-Vet Initial Complaint, the insurance company's refusal to defend the policyholder on the basis of the original complaint constitutes a breach of contract. *See Rhodes v. Chicago Ins. Co.*, 719 F.2d 116, 120 (5th Cir. 1983). A subsequent amended complaint, for which the insurance company agrees to provide a defense, does not erase the breach for failure to defend as to the initial complaint. *Id.*

In March of 2009, Premier and Multi-Vet agreed to settle the Multi-Vet Suit. (Premier Compl. ¶ 27.) The Multi-Vet Suit was dismissed with prejudice. (Premier Compl. ¶ 27.) On May 5, 2009, Premier filed the instant action in this Court. Travelers responded.

## II. Standard of Review

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. *Celotex*, 477 U.S. at 322-24. These facts must be presented in the form of exhibits and sworn affidavits. Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (*quoting Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (*citing Celotex*, 477 U.S. at 323-24).

Where the court is faced with cross motions for summary judgment, as here, the court must review each motion separately on its own merits. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "Resolution of the instant matter through a grant of summary judgment is 'especially appropriate . . . because the construction of insurance contracts is a legal question well suited for resolution by the court.'" *W. Am. Ins. Co. v. Johns Bros., Inc.*, 435 F. Supp. 2d 511, 513-14 (E.D. Va. 2006) (*quoting Clark v. Metro. Life Ins. Co.*, 369 F. Supp. 2d 770, 774 (E.D. Va. 2005)) (alteration in original).

### III. Analysis

Travelers owed Premier a duty to defend in the Multi-Vet litigation if: (1) Premier's conduct, as alleged in the Multi-Vet Suit, constituted one of the offenses enumerated by the Policy giving rise to advertising injury; (2) Premier's conduct occurred in the course of advertising its goods, products, or services; and, (3) the advertising activities caused Multi-Vet's alleged harm. *See Solers, Inc.*, 146 F. Supp. 2d at 792. Because this Court finds that the Multi-Vet Initial Complaint fails to satisfy the requirement that it allege conduct in the course of advertising, or that, even if it does allege such conduct, it fails to allege any resulting harm, the Court finds that the Multi-Vet Initial Complaint did not invoke Travelers' duty to defend Premier.

    A.    **Rules of Construction for Virginia Contracts**

        1.    **Virginia Courts Construe Insurance Contracts Pursuant to the Eight Corners Rule**

A court exercising diversity jurisdiction applies the substantive law of the forum state. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78-79 (1938). The parties correctly agree that Virginia law

controls the issue at bar.[7] An insurance company's duty to defend is broader than its obligation to pay. *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 155 (4th Cir. 2009) (*citing Brenner v. Lawyers Title Ins. Corp.*, 397 S.E.2d 100, 102 (Va. 1990); *see Morrow Corp. v. Harleysville Mut. Ins. Co.*, 101 F. Supp. 2d 422, 426-27 (E.D. Va. 2000) (stating that "if there is no duty to defend *ab initio*, there can be no duty to indemnify"). The duty to defend arises when the complaint asserts allegations against the policyholder, some of which, if proved, would fall within the scope of the policy's coverage. *Bohreer v. Erie Ins. Group*, 475 F. Supp. 2d 578, 584 (E.D. Va. 2007); *Am. & Foreign Ins. Co. v. Church Sch. in the Diocese of Va.*, 645 F. Supp. 628, 630 (E.D. Va. 1986) ("*Church Schools*"). Virginia law relieves the insurance company of its duty to defend only if the claims set forth in the complaint against the policyholder clearly allege harm not covered under the policy. *Church Schools*, 645 F. Supp. at 631. "If coverage is in doubt, the insurance company must defend." *Id.*

To determine which allegations in a complaint fall within the scope of an insurance policy's coverage, Virginia courts abide by the Exclusive Pleading Rule and the Potentiality Rule. *Bohreer*, 475 F. Supp. 2d at 584. The Exclusive Pleading Rule requires that courts determine the insurance company's duty to defend "solely by the claims asserted in the pleadings," while the Potentiality Rule mandates that any "potentiality" that the plaintiff's allegations may state a claim covered by the insurance policy triggers the insurance company's duty to defend. *Solers, Inc.*, 146 F. Supp. 2d at 791. These two rules combine into what is called

---

[7] Virginia law finds that "'a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured.'" *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635-36 (4th Cir. 2005) (*quoting Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 419 (4th Cir. 2004). The parties appear to agree that the policies were delivered to Premier in Virginia.

"the Eight Corners Rule," which requires the Court "'to compare the four corners of the insurance policy against the four corners of the underlying complaint [to determine] if any allegations may potentially be covered by the policy.'"[8] *CACI Int'l*, 566 F.3d at 153 (*citing Capitol Envtl. Servs., Inc. v. N. River Ins. Co.*, 536 F. Supp. 2d 633, 640 (E.D. Va. 2008)) (alteration in original). The nature of the policyholder's conduct trumps the form of the action pleaded, requiring the insurance company to defend if any allegations *potentially* state a claim covered by the policy. *Transcon. Ins. Co. v. Caliber One Indem. Co.*, 367 F. Supp. 2d 994, 1004 (E.D. Va. 2005).[9]

### 2. The Court Can Consider the Original Language in COVERAGE B When Employing the Eight Corners Rule

Travelers argues that the Court cannot consider the portion of the Policy which was deleted and replaced by the Web Xtend Liability endorsement because that deleted language "is now extrinsic evidence . . . and can play no role in the Court's construction" of the Policy. (Def. Resp. to Pl. Mem. Addressing the Trademark Infringement Exclusion Deleted from Travelers' Wed Xtend Endorsement 4.) Travelers further asserts that this deleted language falls outside the parameters of the Eight Corners Rule. This Court finds otherwise.

---

[8] Application of the Eight Corners Rule requires the Court to consider only the underlying complaint itself, and to decline to look at any documents attached to the complaint or on which the complaint relies. *CACI Int'l*, 566 F.3d at 156 (noting that "Virginia courts have not signaled a readiness to look beyond the underlying complaint" in applying the Eight Corners Rule).

[9] Travelers directs this Court to *Church Schools* for the proposition that a policyholder is covered only if the allegations of the underlying complaint "actually state a specific claim for relief identical to one of the articulated covered offenses under Coverage B." (Def. Mem. Supp. Partial Summ. J. 16.) Because this Court rests its decision on another basis, it need not address Travelers' assertion in this regard.

The entirety of the policy before the Court includes both the original language in COVERAGE B, and the Web Xtend Liability endorsement. The endorsement did not physically remove the language from the policy, but rather added the new language, indicating that it replaced the earlier coverage: "The definition of 'Personal and advertising injury . . . is deleted in its entirety and replaced by the following definitions of 'advertising injury' and 'personal injury.'" (Premier Compl. Ex. A.4 §V.)[10] Both definitions fall within the four corners of the Policy before the Court.

"To construe each clause or endorsement in isolation and without reference to the other policy provisions would do violence to basic contract law for insurance contracts, like other contracts, must be read and construed as a whole and not piecemeal." *Nationwide Mut. Ins. Co. v. Akers*, 340 F.2d 150, 154 (4th Cir. 1965). An "endorsement is not a complete contract in itself." *Id.* Certainly a five-page endorsement that purports to change sections of the original sixteen-page policy cannot be read to replace entirely the underlying policy. The Court will consider, to the extent necessary, the entirety of the contract before it.[11]

---

[10] Premier's Exhibit A consists of a series of separately paginated documents. Here, the Court cites to the numbered pages of the Web Xtend Liability agreement.

[11] Premier seeks to cite the explicit removal of the trademark exclusion to its advantage. The deletion of the exclusion and its replacement with the revised Coverage B section, which contains no exclusion for trademark infringement, could suggest that coverage for trademark infringement was restored. *See Adolfo House Distrib. Co. v. Travelers Prop. & Cas. Ins. Co.*, 165 F. Supp. 2d 1332, 1340 n.4 (S.D. Fla. 2001); *Bay Elec. Supply, Inc. v. Travelers Lloyds Ins. Co.*, 61 F. Supp. 2d 611, 617 (S.D. Tx. 1999); *Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 576 n.3 (Minn. 2009); *Acuity v. Bagadia*, 750 N.W.2d 817, 826 (Wis. 2008).
However, several cases have found that patent does not merit coverage as an advertising injury under similar policy language. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Advanced Interventional Sys., Inc.* 824 F. Supp. 583, 586 (E.D. Va. 1993) (applying California law). Travelers, citing these cases, argues that because "copyright" was included and "trademark" was not included in the Web Xtend endorsement, excluding trademark from coverage under the

B.  **The Parties Dispute Whether Coverage for Infringement of Copyright, Title or Slogan Includes Coverage for Trademark Infringement**

The parties place before the Court an undefined Policy term. The Policy defines "advertising injury" to include "[i]nfringement of copyright, title or slogan," but the term "title" itself remains undefined. (Premier Compl. Ex. A.4 § V.c.)

On one hand, Travelers suggests that the ordinary meaning of title, especially in this context, must mean "'the title of the distinguishing name of a written, printed, or filmed production;' 'a similar distinguishing name of a musical composition or a work of art,'" and thus excludes coverage for trademark infringement. (Def. Mem. Supp. Mot. Partial Summ. J. 11.) On the other hand, Premier argues that the Multi-Vet allegations merit coverage under the provision of the Policy which provides coverage for advertising injury based on infringement of title because title means "'a descriptive name, appellation.'" (Pl. Mem. Opp'n to Def. Mot. Partial Summ. J. 9 (*quoting Webster's Ninth New Collegiate Dictionary* 1238 (9th ed. 1991).) This, Premier argues, would cover appellations such as "GENTLE SPRAY."

The parties present extensive briefing on a developing dispute in the courts as to whether infringement of copyright, title or slogan includes trademark infringement.[12] The Court need not

---

phrase "infringement of copyright, title or slogan" must follow. *See U.S. Test, Inc. v. NDE Envtl. Corp.*, 196 F.3d 1376, 1381 (Fed. Cir. 1999). Those patent cases generally do not evaluate the existence of any previous policy language. In any event, the Court need not resolve this issue.

[12] Only one unpublished Virginia case has addressed this policy language. In *Northern Virginia Funeral Choices v. Erie Insurance Company*, the Circuit Court for Fairfax County found the phrase "infringement of copyright, title or slogan" broad enough to encompass a claim of trademark infringement. No. 163598, 2003 WL 1960687, at *2 (Va. Cir. Ct., Mar. 21, 2003). Without engaging in a full contract interpretation analysis, the Circuit Court for Fairfax County considered and expressly rejected the interpretations of trademark and trade dress infringement enunciated by the United States Court of Appeals for the Sixth Circuit in *Advance Watch Co. v. Kemper National Insurance Co.*, 99 F.3d 795 (6th Cir. 1996), and *ShoLodge, Inc. v. Travelers*

evaluate these arguments, however, because Premier fails to meet the latter requirements needed to invoke the duty to defend.

### C. Premier's Alleged Activities Did Not Occur In the Course of Advertising or, in the Alternative, Cause Harm

In order to invoke the duty to defend, the Multi-Vet Suit must allege that Premier's activities occurred in the course of advertising its goods, services, or products. As noted above, the duty to defend arises when the complaint asserts allegations against the insured, some of which, if proved, would fall within the scope of the policy's coverage. *Bohreer*, 475 F. Supp. 2d at 584; *Church Schools*, 645 F. Supp. at 630. Virginia law relieves the insurance company of its duty to defend only if the claims set forth in the complaint against the policyholder clearly allege harm not covered under the policy. *Church Schools*, 645 F. Supp. at 631. "If coverage is in doubt, the insurance company must defend." *Id.*

#### 1. Evaluating the Multi-Vet Initial Complaint Under Fourth Circuit and Virginia Federal Precedent

The Court finds that the Multi-Vet allegations fail to carry the burden of this second requirement to invoke the duty to defend. The Policy requires that any advertising injury occur "in the course of advertising your goods, products or services." (Premier Compl. Ex. A.1.b.(2).) Premier contends that advertising, an undefined term in the policy, should be construed broadly for coverage. Virginia courts interpret insurance policies under the rules of contract

---

*Indemnity Co. of Illinois*, 168 F.3d 256 (6th Cir. 1999), in which the Sixth Circuit held that trademark infringement does not constitute infringement of title. *Id.*
    Instead, the *Funeral Choices* Court adopted what it characterized as the "more modern and majority rule" enunciated by the United States Court of Appeals for the Seventh Circuit's interpretation of the phrase "infringement of copyright, title or slogan," which the Seventh Circuit determined includes trademark infringement. *Id.* at *2 (*citing Charter Oak Fire Ins. Co. v. Hedeen & Co.*, 280 F.3d 730 (7th Cir. 2002)).

interpretation. *KBS, Inc. v. Great Am. Ins. Co. of N.Y.*, No. 3:04cv730, 2006 WL 3538985, at *6 (E.D. Va. Dec. 7, 2006); *Transcon. Ins. Co.*, 367 F. Supp. 2d at 1001. When, as here, a contract fails to define terms of the agreement, courts should "giv[e] words that are not expressly defined their 'usual, ordinary, and popular meaning,' to determine if the plain language of the policy provides the answer." *W. Am. Ins. Co.*, 435 F. Supp. 2d at 516 (quotation omitted); *see Church Schools*, 645 F. Supp. at 632 (noting that Virginia courts that have construed the term "bodily injury" in an insurance policy have interpreted the language to cover physical injury to the body and to exclude claims for nonphysical or emotional harm). Such words "should be given their natural and ordinary meaning as understood in the business world." *Solers*, 146 F. Supp. 2d at 789.

A case from the United States Court of Appeals for the Fourth Circuit applying North Carolina law defines advertising as follows: "The term 'advertising' normally refers to '[a]ny oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business.'" *State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*, 343 F.3d 249, 259 (4th Cir. 2003) (*citing Elan Pharm. Research Corp. v. Employers Ins. of Wausau*, 144 F.3d 1372, 1377 (11th Cir. 1998) (alteration in original)). However, prior to the decision in *State Auto*, a court in this district had already adopted a "narrow definition of 'advertising'" under Virginia law. *Solers*, 146 F. Supp. 2d at 793. In the absence of Virginia or Fourth Circuit precedent, *Solers* cited with approval the majority of cases that had "found the term 'advertising' to refer *unambiguously* to the widespread distribution of promotional material to the public at large, or at least to widely disseminated solicitation or promotion." *Id.* (emphasis added). In *Solers*, the Court held that no duty to defend existed because the two meetings at issue, which

involved one-on-one solicitation of business, did not fit the definition of advertising. *Id.* at 794-95. The Court defined advertising as follows: "Advertising is the widespread promotion of goods or services to the public at large, or to the company's customer base." *Id.* at 787.

Here, the Multi-Vet Initial Complaint alleges improper sale of items and misuse of Multi-Vet's trademarks. The Multi-Vet Initial Complaint seeks an injunction against advertising in its prayer for relief, but it fails to allege any facts as to advertising at all, much less harm from advertising, in the allegations it placed before the New York federal court. In *Solers,* the Court found that solicitation did not constitute advertising. *Id.* at 795. Given this precedent, this Court finds that "sale" and "use," which the Mutli-Vet Initial Complaint alleges without any further context, could not constitute advertising, or "widespread promotion" (as opposed to sale) of goods.

Even if this Court construed the allegations broadly toward a duty to defend, the Multi-Vet Initial Complaint fails to allege clearly that Premier's advertising activities caused injury. Instead, the complaint alleges that "Premier has sold and is selling dog training collars . . . bearing the infringing designations 'Gentle Spray' and 'Gentle Leader Spray Sense;'" that Premier's "sale" gives rise to a likelihood of confusion; and that Premier's "use" of the infringing designations constitutes false and misleading descriptions and representations of fact, misleads and confuses the public and creates a likelihood of injury to Multi-Vet's public image and reputation, and is likely to make the public "falsely associate the attributes and characteristics of Multi-Vet's products to the dog training collars originating from Premier." (Multi-Vet Initial Compl. ¶¶ 16, 18, 24, 30-31.) None of the claims directly alleges harm due to Premier's advertising of its goods, products, or services. The gravamen of the Multi-Vet Initial Complaint

16

clearly appears to be "use" and "sale" of products bearing Multi-Vet's trademarks. *See Simply Fresh Fruit, Inc. v. Cont'l Ins. Co.*, 94 F.3d 1219, 1222-23 (9th Cir. 1996) (finding that "[t]he gravamen of the patent infringement claim is the *use* alone").

The first mention of advertising occurs in the Multi-Vet Initial Complaint's prayer for relief, where Multi-Vet requests that the court enjoin Premier from "advertising, [or] promoting . . . dog training collars . . . confusingly similar to Multi-Vet's" products. (Multi-Vet Initial Compl. Prayer for Relief a(i).) Although Multi-Vet seeks an injunction from future advertising, the Multi-Vet Initial Complaint does not clearly allege past advertising-related conduct. Therefore, the Multi-Vet Initial Complaint insufficiently alleges that Premier's infringing activities occurred in the course of advertising Premier's goods, services, or products.

Even deciding, if this is in doubt, that the duty to defend should commence, the Multi-Vet Initial Complaint insufficiently alleges advertising activities that resulted in harm to Multi-Vet. Instead, the alleged harm appears to derive from the trademark infringement itself, not advertising activities. *Cf. IDG, Inc. v. Cont'l Cas. Co.*, 275 F.3d 916, 922-23 (10th Cir. 2001).

### 2. Cases Finding that Use of Trademark Implies Advertising and Advertising Injury Do Not Persuade

In an effort to countermand this difficulty, Premier points the Court to jurisdictions that have determined that the inherent nature of a trademark eliminates the need to prove the causal nexus between advertising activities and advertising injuries. *Am. Employers' Ins. Co. v. DeLorme Publ'g Co., Inc.*, 39 F. Supp. 2d 64, 74 (D. Me. 1999) (noting that a trademark "inherently and necessarily implicates possible advertising activities") (*"DeLorme Publ'g"*); *see Northam Warren Corp. v. Universal Cosmetic Co.*, 18 F.2d 774, 774 (7th Cir. 1927) (stating that

"[a] trade-mark is but a species of advertising"); *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group*, 59 Cal. Rptr. 2d 36, 41 (Cal. Ct. App. 1996). These decisions flow from the notion that a trademark may serve "as a prime instrument in the advertisement and sale of the seller's goods," *State Auto*, 343 F.3d at 257 (*citing J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition* § 3:2 (4th ed. 2003)), and that the trademark "has the potential to be an advertising idea." *Id.* at 258.

Even viewing the record broadly in favor of a duty to defend, this Court cannot find that consideration of these cases places coverage in doubt so as to raise the duty to defend. First, none of the cases construe Virginia law, which this Court is obliged to apply. As noted above, the one case construing Virginia law as to the meaning of "advertising" appears to place the allegations outside the duty to defend. *See Solers, Inc.*, 146 F. Supp. 2d at 787.

Second, several of the cases Premier places before the Court specifically make a finding that they reviewed a complaint that sufficiently pled advertising activities so as to invoke the duty to defend or to provide coverage, and this Court cannot make such a finding. *See, e.g., DeLorme Publ'g*, 39 F. Supp. 2d at 74 ("In the case at bar, the counterclaim specifically and explicitly alleges that the offense was partly committed in the course of DeLorme's advertising."); *Lebas Fashion Imports*, 59 Cal. Rptr. 2d at 41, n.6 (presuming that trademark infringement occurred in the course of advertising and that a nexus existed while noting that the complaint specifically alleged used of the offending marks "in advertisements"). Even in *State Auto*, where the Fourth Circuit held that the use of the "Nissan" name on a website for a computer company owned by Mr. Uzi Nissan invoked a duty to defend because Nissan was a "quintessential example of a trademark functioning to advertise a company's products," *State Auto*, 343 F.3d at 258, the

Fourth Circuit found that events occurred in the course of advertising, in part, because the complaint alleged that the "offending websites" were used "for advertisement purposes."[13] *Id.* at 259 (citing underlying complaint). Indeed, in *State Auto*, the Fourth Circuit found it need not decide whether or not trademark infringement would always involve advertising activities because the complaint in that case specifically challenged advertising activities. *Id.* at 259, n.14. The allegations in the Multi-Vet Initial Complaint do not permit this Court to make an analogous finding.

Finally, if this Court were to compare cases finding that injury must be alleged independent of activity in the course of advertising, no duty to defend could be found here. The Multi-Vet Initial Complaint alleges no causal nexus for injury. Courts have held that, in order to establish coverage under an insurance policy, the plaintiff's advertising activities must cause the injury alleged, "not merely expose it." *Simply Fresh Fruit, Inc.*, 94 F.3d at 1222-23. "For example, a claim of patent infringement does not fall within the advertising injury coverage, 'even though the insured advertises the infringing product, if the claim of infringement is based on the sale or importation of the product rather than its advertisement.'" *Microtec Research, Inc. v. Nationwide Mut. Ins. Co.*, 40 F.3d 968, 971 (9th Cir. 1994) (*quoting Bank of the West v. Superior Court*, 833 P.2d 545, 559 (Ca. 1992); *see IDG, Inc.*, 275 F.3d at 922-23 (finding that claims of copyright infringement existed independent of any promotional activity related to advertising, and as such, the harm alleged derived from the copyright infringement itself rather than any advertising injury).

---

[13] The Court notes that "Gentle Spray" may not qualify as the quintessential example of the trademark/advertising overlap that "Nissan" does.

In sum, this Court does not have before it a complaint that alleges that an offense was committed in the course of advertising, or that harm from advertising resulted. Therefore, the Court finds that the Multi-Vet Initial Complaint failed to allege that Premier's conduct occurred "in the course of advertising." Thus, Travelers owed no duty to defend.

### IV. Conclusion

For the foregoing reasons, the Court shall DENY Plaintiff's Motion for Partial Summary Judgment. (Docket No. 18.) The Court shall GRANT Defendant's Motion for Partial Summary Judgment. (Docket No. 16.)

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States Magistrate Judge

Richmond, Virginia
Entered: 1-5-10